Oliver J. H. Stiefel, OSB # 135436
(503) 227-2212 │ oliver@crag.org
Meriel L. Darzen, OSB # 113645
(503) 525-2725 │ meriel@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214
Fax: (503) 296-5454

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| **CASCADIA WILDLANDS**, an Oregon non-profit corporation; **OREGON WILD**, an Oregon non-profit corporation; and **WILLAMETTE RIVERKEEPER**, an Oregon non-profit corporation; | Case No. |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | (5 U.S.C. § 706(2)) |
| **DAVID WARNACK**, in his official capacity as Willamette National Forest Supervisor; and the **UNITED STATES FOREST SERVICE**, | (Environmental Matters – National Forest Management Act, National Environmental Policy Act, and Administrative Procedure Act) |
| Defendants. | |

## NATURE OF ACTION

1.      Plaintiffs Cascadia Wildlands, Oregon Wild, and Willamette Riverkeeper (collectively, "Cascadia") bring this challenge under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, to the final administrative actions of David Warnack and the United States Forest Service (collectively "Forest Service" or "Defendants"). In approving the Decision Memorandum ("DM") for the Willamette 2020 Fires Roadside Danger Tree Reduction Project ("2020 Roadside Project" or "Project") on the Willamette National Forest ("Forest"), Defendants acted arbitrarily, capriciously, and contrary to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h, and the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600–1614.

2.      The DM authorizes the cutting of "danger" trees along approximately 404 miles of National Forest System roads within the footprint of the 2020 Holiday Farm, Beachie Creek, and Lionshead fires. Most of the identified roads receive very low traffic volumes (if any), and most of the trees targeted for cutting pose no immediate risk (if any). The DM simply states, without specific support, that there is an urgency to act, but does not explain why a more searching and careful analysis could not be completed that balances ecological and social trade-offs. Instead, the Forest Service rushed to authorize logging operations, including commercial "salvage" logging, across thousands of acres of the Forest.

3.      Under NEPA, the Forest Service did not prepare an Environmental Impact Statement ("EIS") or even a less intensive Environmental Assessment ("EA"), and instead approved the Project pursuant to a Categorical Exclusion ("CE"). CEs apply to categories of actions that the Forest Service has determined pose no significant environmental effects, either

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—2

individually or cumulatively. The Forest Service approved the Project pursuant to a CE applicable to "repair and maintenance" of roads: 36 C.F.R. § 220.6(d)(4).

4.      Cascadia challenges the Forest Service's reliance on the road "repair and maintenance" CE for this Project. The Forest Service proposes to salvage log, through numerous individual timber sales, thousands of acres across the Project area. The Forest Service has failed to articulate a rational explanation as to why such a major salvage logging project constitutes routine road "repair and maintenance" when the Project targets tens of thousands of trees. Before approving a project of this magnitude, the Forest Service is obligated to prepare an EIS or EA.

5.      Proper review under an EIS or EA would force the Forest Service to take the required "hard look" at the Project's environmental impacts, including impacts to ESA-listed northern spotted owls and salmonids, and important habitat classified as "Riparian Reserves." In fact, the Forest Service concedes that the Project is "likely to adversely affect" northern spotted owls, but failed to inform the public and decisionmaker of the scope and magnitude of the impacts or consider any alternatives that would lessen such impacts.

6.      Cascadia respectfully requests this Court to vacate the DM and remand to the Forest Service for preparation of an EIS or EA for a full and fair analysis of the Project's impacts.

7.      If necessary, Cascadia intends to seek narrowly tailored injunctive relief during the pendency of this litigation to protect sensitive species and their habitats.

8.      Should it prevail, Cascadia will seek attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or any other applicable authorities.

///

///

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—3

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Cascadia's claims present a federal question. A present, actual, and justiciable controversy exists between the parties. The requested relief for a declaratory judgment is proper under 28 U.S.C. § 2201, and the requested injunctive relief is proper under 28 U.S.C. § 2202.

10.    Cascadia exhausted its administrative remedies by submitting scoping comments. The challenged agency action is subject to this Court's review under 5 U.S.C. §§ 702, 704, and 706. Defendants have waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Project area is located within this judicial district. Defendants maintain an office in this judicial district. Plaintiffs Cascadia Wildlands, Oregon Wild, and Willamette Riverkeeper maintain offices in this District.

12.    This case is properly filed in the Eugene Division pursuant to Local Rule 3-2 because a substantial part of the Project area, and Defendants' office where the decision was signed, are located in Lane County. A substantial part of the events or omissions giving rise to this claim occurred and the property that is subject to this action is situated in the Eugene Division.

## PARTIES

### Plaintiffs

13.    Plaintiff CASCADIA WILDLANDS is a non-profit corporation headquartered in Eugene, Oregon, with approximately 12,000 members and supporters throughout the United States. Cascadia Wildlands educates, agitates, and inspires a movement to protect and restore wild ecosystems in the Cascadia Bioregion, extending from Northern California up into Alaska.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—4

Cascadia Wildlands envisions vast old-growth forests, rivers full of salmon, wolves howling in the backcountry, and vibrant communities sustained by the unique landscapes of the Cascadia Bioregion. Cascadia Wildlands' members have used and will continue to use the Project area for activities such as hiking, bird watching, camping, swimming, fishing, foraging, photography, and other recreational and professional pursuits.

14.     Plaintiff OREGON WILD is a non-profit corporation with approximately 20,000 members and supporters throughout the state of Oregon and the Pacific Northwest. Oregon Wild is headquartered in Portland, Oregon and maintains field offices in Bend, Eugene, and Enterprise, Oregon. Oregon Wild's mission is to protect and restore Oregon's wildlands, wildlife, and waters as an enduring legacy. Oregon Wild's wilderness, old-growth forest, and clean rivers/watersheds programs protect pristine drinking water, unparalleled recreation opportunities, and fish and wildlife habitat across Oregon.

15.     Plaintiff WILLAMETTE RIVERKEEPER is a non-profit corporation headquartered on the Willamette River in Portland, Oregon. Willamette Riverkeeper serves as the eyes, ears, and voice of the Willamette River. For more than 20 years, the organization's sole mission has been to protect and restore the Willamette River's water quality, habitats for wildland and aquatic species, and resources. Willamette Riverkeeper believes that a river with good water quality and abundant natural habitat, safe for fishing and swimming, is a basic public right. Willamette Riverkeeper engages in public outreach and education, advocacy with agencies, agency administrative processes, habitat restoration, Superfund cleanup, Clean Water Act compliance, and where necessary, litigation. Here, where the Project's impacts will negatively affect basin water quality, essential water quality functions, and fish and wildlife habitat, Willamette Riverkeeper joins as a Plaintiff to protect the organization's and its members'

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—5

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

interests in the North Santiam, Santiam, and McKenzie Rivers, which are important tributaries of the Willamette River, and within the Project area. Willamette Riverkeeper brings this action on behalf of itself and its affected staff, and its nearly 2,500 members.

16.     Plaintiffs' staff, members, and supporters regularly visit and enjoy the Forest, including the Project area, and intend to do so again in the near future. The staff, members, and supporters appreciate the aesthetics of the Forest, including its waters and wildlife, and use the area to engage in recreational, scientific, and spiritual activities, such as hunting, hiking, camping, fishing, photography, watershed research, and observing wildlife.

17.     Plaintiffs have organizational interests in the proper and lawful management of the Forest. Plaintiffs, and their members, supporters, and staff have participated extensively in relevant administrative actions and have actively participated in the Project's administrative process.

18.     Plaintiffs, and their members, supporters, and staff would sustain injury to aesthetic, educational, recreational, spiritual, and scientific interests if the Project proceeds as authorized. Plaintiffs, and their members, supporters, and staff have concrete plans to return to the area where the Project is proposed. Unless this Court grants the requested relief, Plaintiffs, and their members, supporters, and staff will be adversely and irreparably harmed by the Project.

**Defendants**

19.     Defendant DAVID WARNACK is the Forest Supervisor for the Forest. Mr. Warnack is the Responsible Official for the Project, and he signed the Decision Memorandum, constituting the final administrative action. As Forest Supervisor, Mr. Warnack has the responsibility to ensure that all projects on the Forest are consistent with applicable laws and regulations. Plaintiff brings this action against Mr. Warnack in his official capacity.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—6

20.     Defendant the UNITED STATES FOREST SERVICE is an agency within the United States Department of Agriculture entrusted with the management of our national forests. The Forest Service is headquartered in Washington, D.C., and it has nine regions across the country. The national forests of Oregon are in Region 6. All or a significant portion of the actions and omissions alleged in this Complaint occurred in Region 6.

## LEGAL BACKGROUND

### National Environmental Policy Act

21.     Congress enacted NEPA to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

22.     To accomplish these purposes, NEPA requires all agencies of the federal government to prepare a "detailed statement" for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Commonly known as the Environmental Impact Statement or EIS, the detailed statement must describe, *inter alia*, the adverse environmental impact of the proposed action and alternatives to the proposed action. *Id.*

23.     NEPA further requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." *Id.* § 4332(2)(E).

24.     The Council on Environmental Quality ("CEQ") promulgated regulations implementing NEPA and elaborating on the requirements of an EIS. 42 U.S.C. § 4342

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—7

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

(establishing CEQ); 40 C.F.R. §§ 1500–1508 (2019) (CEQ's NEPA regulations). CEQ modified the NEPA regulations by final rule on July 16, 2020. 40 C.F.R. §§ 1500–1508 (2021).

25.    On his first day of office, President Biden issued Executive Order 13990: Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis.[1] The policy statement of EO 13990 provides that the policy of the Biden Administration is to, *inter alia*, listen to the science and to improve public health and protect our environment. EO 13990 directs the heads of all agencies to immediately review all existing regulations, orders, guidance documents, policies, and any similar agency actions promulgated, issued, or adopted between January 20, 2017, and January 20, 2021 that are inconsistent with the policy statement.

26.    The Biden Administration provided a non-exclusive list of agency actions that the heads of relevant agencies will review in accordance with EO 13990. *See* Fact Sheet: List of Agency Actions for Review.[2] The modification of the CEQ regulations and guidance document procedures is the first item on President Biden's list.

27.    The heads of some executive agencies and departments already have taken action pursuant to EO 13990. *See, e.g.*, Secretary of the Interior Order ("SO") No. 3399: Department-Wide Approach to the Climate Crisis and Restoring Transparency and Integrity to the Decision-Making Process.[3] SO 3399 provides that "Bureaus/Offices will not apply the 2020 Rule in a manner that would change the application or level of NEPA that would have been applied to a proposed action before the 2020 Rule went into effect on September 14, 2020."

---

[1] *Available at h*ttps://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-protecting-public-health-and-environment-and-restoring-science-to-tackle-climate-crisis/

[2] *Available at* https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/20/fact-sheet-list-of-agency-actions-for-review/

[3] *Available at* https://www.doi.gov/sites/doi.gov/files/elips/documents/so-3399-508_0.pdf

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—8

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

28.     A similar directive applicable to the Forest Service/U.S. Department of

Agriculture is forthcoming.

29.     Under the 2020 NEPA regulations, agencies are to determine the appropriate level

of NEPA review for a given project. 40 C.F.R. § 1501.3 (2021). Agencies must determine

whether the proposed action: (1) Normally does not have significant effects and is categorically

excluded; (2) is not likely to have significant effects or the significance of the effects is unknown

and is therefore appropriate for an environmental assessment ("EA"); or (3) is likely to have

significant effects and is therefore appropriate for an EIS. *Id.*

30.     CEQ regulations direct federal agencies to identify in their NEPA procedures

certain categories of actions that normally do not require preparation of an EA or EIS. *See* 40

C.F.R. § 1501.4(a) (2021); 40 C.F.R. § 1508.4 (2019). The Forest Service promulgated a series

of categorical exclusions pursuant to the previous version of the CEQ regulations, which defined

"categorical exclusion" as a "category of actions which do not individually or cumulatively have

a significant effect on the human environment and which have been found to have no such effect

by a federal agency in implementation of these regulations. 40 C.F.R. § 1508.4 (2019); 57 Fed.

Reg. 43,180 (Sept. 18, 1992) (establishing categories); 73 Fed. Reg. 43,084 (July 24, 2008)

(placing established categories under Forest Service NEPA regulations at 36 C.F.R. Part 220).

31.     36 C.F.R. § 220.6(a) provides that a proposed action may be categorically

excluded from further analysis and documentation in an EIS or EA "only if there are no

extraordinary circumstances related to the proposed action" and if it is within one of the

categories established by the Secretary or it is within a category listed in Section 220.6(d) and

(e).

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

32.    36 C.F.R. § 220.6(b) lists the "resource conditions" that should be considered in determining whether extraordinary circumstances related to a proposed action warrant further analysis and documentation in an EA or EIS, including "Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species." *Id.* § 220.6(b)(1)(i). According to 36 C.F.R. § 220.6(b)(2), the "mere presence of one or more of the resource conditions does not preclude use of a categorical exclusion; it is the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions, and if such a relationship exists, the degree of potential effect of a proposed action on these resource conditions that determines whether extraordinary circumstances exist."

33.    36 C.F.R. § 220.6(d) lists the categories of actions for which a project or case file and decision memo are not required. One such category is the repair and maintenance of roads, trails, and landline boundaries. *Id.* § 220.6(d)(4). Examples include, but are not limited to:

(i)     Authorizing a user to grade, resurface, and clean the culverts of an established National Forest System road;

(ii)    Grading a road and clearing the roadside of brush without the use of herbicides;

(iii)   Resurfacing a road to its original condition;

(iv)    Pruning vegetation and cleaning culverts along a trail and grooming the surface of the trail; and

(v)     Surveying, painting, and posting landline boundaries.

34.    36 C.F.R. § 220.6(e) lists the categories of actions for which a project or case file and decision memo are required. One such category is salvage of dead and/or dying trees not to exceed 250 acres, requiring no more than ½ mile of temporary road construction. 36 C.F.R. § 220.6(e)(13). Examples include, but are not limited to:

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—10

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

    (i)      Harvest of a portion of a stand damaged by a wind or ice event and construction of a short temporary road to access the damaged trees; and

    (ii)     Harvest of fire-damaged trees.

35.     Forest Service regulations require "scoping" for all Forest Service proposed actions, including those that would be categorically excluded from further analysis and documentation in an EA or EIS. 36 C.F.R. § 220.4(e)(1). "If the responsible official determines, based on scoping, that it is uncertain whether the proposed action may have a significant effect on the environment," the Forest Service must prepare an EA. 36 C.F.R. § 220.4(e)(2). "If the responsible official determines, based on scoping, that the proposed action may have a significant environmental effect," the Forest Service must prepare an EIS. *Id.*

36.     NEPA regulations allow for "tiering." Tiering "refers to the coverage of general matters in broader [EISs] or [EAs] (such as national program or policy statements) with subsequent narrower [EISs] or [EAs] (such as regional or basin-wide program [EISs] or ultimately site-specific [EISs]) incorporating by reference the general discussions and concentrating solely on the issues specific to the [EIS] subsequently prepared." 40 C.F.R. § 1508.1(ff) (2021).

37.     Under 40 C.F.R. § 1501.11(a) (2021), "agencies should tier their [EISs] and [EAs] when it would eliminate repetitive discussions of the same issues, focus the actual issues ripe for decision, and exclude from consideration issues already decided or not yet ripe at each level of environmental review." Under 40 C.F.R. § 1501.11(c) (2021), "[t]iering is appropriate when the sequence from an [EIS] or [EA] is (1) From a programmatic, plan, or policy [EIS] or [EA] to a program, plan, or policy statement or assessment of lesser or narrower scope or to a site-specific [EIS] or [EA]"[;] (2) From an [EIS] or [EA] on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent [EIS] or

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

[EA] at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the lead agency to focus on the issues that are ripe for decision and exclude from consideration issues already decided or not yet ripe."

**National Forest Management Act (NFMA)**

38.     The Forest is part of the National Forest System and is therefore subject to NFMA and its planning regulations.

39.     Pursuant to NFMA, management of National Forests occurs at two levels: forest and project. At the forest level, NFMA requires the Secretary of Agriculture to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." 16 U.S.C. 1604(a).

40.     The Forest Service, which manages the National Forest System, uses these plans, called "forest plans," to guide all natural resource management activities, including use of the land for outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness. 36 C.F.R. § 219.1 (2000); 16 U.S.C. § 1604(e)(1). A forest plan is a broad, long-term programmatic planning document for the entire forest, containing goals and objectives for individual units of the forest and providing standards and guidelines for management of forest resources.

41.     At the project level, once a forest plan is in place, site-specific actions or "projects" are planned and evaluated by the Forest Service. Each site-specific project must be consistent with the governing forest plan. 16 U.S.C. § 1604(i).

42.     In 1990, the Forest Service adopted the Willamette National Forest Land and Resource Management Plan ("Forest Plan"), which provides standards and guidelines for project-level planning within the Forest.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—12

43.    In 1994, the Forest Service and the Bureau of Land Management adopted the Record of Decision for the Northwest Forest Plan ("NWFP"). The NWFP established management requirements for all Forest Service and Bureau of Land Management land within the range of the northern spotted owl. The NWFP contains mandatory standards relating to the protection of northern spotted owl.

44.    The Forest is within the range of the northern spotted owl; the Forest Plan has been amended to include the management direction included in the NWFP.

45.    All management activities, actions, and projects on the Forest must comply with the Forest Plan and NWFP. In the event that there are differences in management direction between the two documents, the more restrictive of the two documents governs.

**Administrative Procedure Act**

46.    The APA confers a right of judicial review on any person adversely affected by agency action within the meaning of a relevant statute. 5 U.S.C. § 702. Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in court are subject to judicial review. 5 U.S.C. § 704.

47.    Upon review under the APA, a court shall "hold unlawful and set aside agency action * * * found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law * * *." 5 U.S.C. § 706(2). Furthermore, when an agency has taken action without observance of the procedure required by law, that action will be set aside. 5 U.S.C. § 706(2)(D).

///

///

///

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

## FACTUAL BACKGROUND

48.     The Willamette National Forest stretches along the western slopes of the Oregon Cascades, extending from the Mt. Jefferson area east of Salem to the Calapooya Mountains northeast of Roseburg, and covering nearly 1.8 million acres.

49.     With elevations ranging from 900 feet along the Santiam River to over 10,000 feet at the summits of Mt. Jefferson and the Three Sisters, the lands in the Forest exhibit a wide variety of geologic and topographic features. The Forest is home to numerous fish and wildlife species, including several salmonid species and northern spotted owl.

50.     The 2020 fire season dramatically impacted the Forest. The Holiday Farm Fire started on September 7 during a strong east wind event and burned approximately 173,393 acres in the McKenzie River watershed. The fire burned a mosaic pattern through most of the area, and the majority burned with low and moderate severity. The fire was declared contained on October 29, 2020.

51.     The Beachie Creek Fire began on August 16, 2020. The historic windstorm on September 7 caused rapid spread through the Willamette and Mt. Hood National Forests. Before containment on October 31, 2020, the fire burned 193,573 acres in the North Fork Santiam River and Little North Fork Santiam River drainages.

52.     Sparked by lightning, the Lionshead Fire began on August 16, 2020 on the Confederated Tribes of Warm Springs Reservation. The historic windstorm on September 7, 2020 caused rapid spread onto the Willamette, Deschutes, and Mt. Hood National Forests. The fire burned 204,469 acres within the Breitenbush River, headwaters of the North Santiam River, and Upper Clackamas River watersheds.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—14

53.     In total, the three fires burned approximately 176,000 acres of National Forest System lands.

54.     There are about 550 miles of National Forest System roads within the perimeter of the fires. Approximately 404 miles of roads, along 362 road segments, are included in the Project.

55.     National Forest System roads receive administrative designations regarding their "operational maintenance level" ("ML"), which refers to the degree of maintenance required and the level of service the road provides. ML 1 roads have been placed in storage for at least one year between intermittent uses. These roads are labeled as "closed" on administrative maps. It is unlawful for the general public to drive on a road labeled as "closed" on administrative maps. Some of the road segments included in the Project are ML 1 (closed) roads (11 out of 362).

56.     ML 2 roads are open for use by high clearance vehicles for dispersed recreation and specialized commercial haul. The majority of roads included in the Project are ML 2 roads (328 out of 364).

57.     ML 3, 4, and 5 roads are open for use by passenger cars for general use, with ML 5 roads providing the highest degree of user comfort and ordinarily receiving the most use by the general public. Only 4 out of 362 road segments are ML 5 roads. Only 1 out of 362 are ML 4 roads, and 18 out of 362 are ML 3 roads.

58.     The roads in the Project area have varying levels of fire-killed, partially burned, or green trees depending on how severely the fires burned in the area. Based on the Rapid Assessment of Vegetation Condition after Wildfire (RAVG) mapping data, about 45% of the roads (190 miles) burned at a very low severity (0% to 25% basal area mortality). 49 miles of the roads burned at low severity (25% to 50% basal area mortality). 66 miles of the roads burned at

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

moderate severity (50% to 75% basal area mortality). About 110 miles of the roads burned at a high severity (75% to 100% basal area mortality).

59.     A "danger tree," according to the Forest Service, is any tree, or portion of a tree that could cause injury or death to people or property because of damage or defect. The Project authorizes the cutting of all "danger trees" along all 404 road miles, regardless of the burn severity of the area, if they are within one tree height distance of the road and meeting additional criteria.

60.     For example, the criteria specify that all trees with no green needles are to be cut. The Forest Service's criteria also identify trees to be cut based on crown volume scorch, or the percentage of the pre-fire crown (a tree's branches and needles) scorched by the fire. For example, Doug-Fir trees with greater than 65% crown volume scorch are identified to be cut.

61.     The Forest Service's criteria are based on internal agency guidance documents, which provide parameters for assessing (1) the trees that pose a high, moderate, or low likelihood of failure, and (2) the living trees that are likely to die within three years of a fire: Region 6's *Field Guide for Danger-Tree Identification and Response along Forest Roads and Work Sites in Oregon and Washington* (Filip et al. 2017) and *Post-Fire Assessment of Tree Status and Marking Guidelines for Conifers in Oregon and Washington* (Hood et al. 2020). Neither of these two internal guidance documents have been subject to public review and scrutiny pursuant to NEPA.

62.     The DM authorizes the cutting of trees that not only pose a high likelihood of failure, but also trees that may pose some risk of failure within 10 years.

63.     For example, agency guidance stipulates that recent dead, large (greater than 20") Doug-Fir and Cedar with no failure indicators have a low likelihood of failure within five years.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—16

Yet, the Project identifies these trees for cutting. These trees do not pose any immediate public safety threat.

64.     The probability of any tree that the Forest Service proposes to cut falling across the road is close to zero. The probability of any tree that the Forest Service proposes to cut falling across the road and causing damage to people or property is infinitesimally small. The Forest Service never has assessed the risks of falling trees in an open and transparent NEPA process, affording the public and experts the opportunity to weigh in.

65.     The Forest Service proposes to cut a high volume of trees principally for economic and efficiency purposes. The agency desires to utilize timber sales as a mechanism to remove trees while they have some commercial value, while avoiding repeated entries along the same road segments.

66.     The Forest Service will be incentivized to make timber sales attractive to buyers—including more trees and larger trees—so that the Forest Service can use commercial timber sales to implement large portions of the Project and make money to fund restoration efforts.

67.     Agency guidance also stipulates that ML 1 and 2 roads are the lowest priority for treatment, due to low traffic volumes and only intermittent exposure to a danger tree (traffic driving by).

68.     Yet, 338 of the 362 road segments identified for treatment are ML 1 and 2 roads. In authorizing a similar roadside project in an area also affected by the Lionshead Fire, the Clackamas Ranger District of the Mt. Hood National Forest excluded ML 1 and 2 roads.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—17

69.     The Forest Service estimates that commercial logging will occur on approximately 240 miles of road, but does not provide any detail on which road segments. The DM does not prohibit commercial logging on the remaining 164 miles.

70.     The DM describes other "connected actions." Actions are connected if they automatically trigger other actions that may require EISs, cannot or will not proceed unless other actions are taken previously or simultaneously, or are independent parts of a larger action and depend on the larger action for their justification. 40 C.F.R. § 1501.9(e)(1).

71.     Road maintenance is a "connected action." Maintenance activities may include road surface blading, ditch and culvert cleaning, and spot rocking.

72.     Project-generated fuels management also is a connected action. Fuels management activities may include (1) lop and scatter material less than three inches diameter, (2) chip material less than seven inches diameter, and (3) pile and burn material.

73.     While timber sale contracts often contain provisions for fuels management, such activities seldom are carried out, and the Forest Service rarely enforces these contract provisions. "Slash" piles—coarse and fine materials like tree branches, generated during logging operations—are a common sight across the Forest.

74.     On March 8, 2021, the Forest Service released the Danger Tree Project Proposal and Scoping Notification Letter. The Letter was accompanied by a series of maps, one for each of the three fire areas, showing the targeted road segments. The areas under consideration included roads that are open or where access allegedly is needed for forest management within the 176,000 acres of the Forest that burned in the three fires. The agency stated its intention to re-open 390 miles of roads.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

75.     The Forest Service provided a 14-day public scoping comment period. On March

19, 2021, Plaintiffs Cascadia Wildlands and Oregon Wild jointly and timely submitted scoping

comments to the Forest Service regarding the information in the Scoping Report. On March 22,

2021, Plaintiff Willamette Riverkeeper timely submitted separate scoping comments and also

incorporated Cascadia Wildlands and Oregon Wild's scoping comments.

76.     Plaintiffs requested that the Forest Service, *inter alia*, (1) retain all green trees

within the fire area; (2) minimize impacts on riparian reserves and aquatic resources; and (3)

consider alternatives such as closing roads and/or limiting cutting to heavily used roads.

Plaintiffs advised that the road maintenance CE is inappropriate for a project of this magnitude

and that any CE was inappropriate given extraordinary circumstances, including significant

impacts to northern spotted owl and listed salmonids. Plaintiffs also highlighted the economic

conflict of interest that arises from commercial timber sales that could lead to ecologically

important large trees being removed for the wrong reasons. Plaintiffs requested the Forest

Service to prepare an EIS so that it could adequately balance the trade-offs between cutting

danger trees and other important objectives such as wildlife habitat, carbon storage, and water

quality/stream shade.

77.     Representatives from Cascadia Wildlands participated in a July 1, 2021, field tour

of proposed logging sites on the McKenzie River Ranger District. They and others raised

concerns verbally with Defendant Warnack and other Forest Service staff including whether the

Forest Service's analysis considered safety risks stemming from the increased landslide potential

that could be exacerbated by the Project. Plaintiffs and others also expressed concern that a

categorical exclusion would be inappropriate for this project given the large acreage involved,

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

the breadth and depth of issues requiring analysis, and the questionable applicability of the chosen categorical exclusion to the proposed project.

78.    Post-fire habitats are inherently fragile. Post-fire logging activities, other than hand-felling select trees and leaving them on site, generally are inconsistent with efforts to restore ecosystem functions after fire.

79.    Large trees that are dead and dying, including those near remote forest roads like those within this Project, provide valuable habitat for a wide variety of wildlife that rely on dead wood in the forest.

80.    The inherent goal of cutting trees needs to be carefully balanced with other resource goals of the Forest, such as wildlife habitat. This is especially true when many trees targeted for cutting pose no immediate danger.

81.    Post-fire logging activities, including commercial salvage logging, can cause habitat loss and fragmentation for wildlife species, including northern spotted owl.

82.    The northern spotted owl was listed as "threatened" under the ESA in 1990 due to widespread habitat loss and inadequate existing regulatory mechanisms. Today, many populations of northern spotted owl continue to decline at alarming rates. As a result of the northern spotted owl's continued decline, in 2020 the U.S. Fish and Wildlife Service determined that the perilous status of the northern spotted owl warrants "uplisting" the species from threatened to "endangered." Managing sufficient habitat for the species now and into the future is therefore vital for its recovery.

83.    Northern spotted owl may forage in post-fire forest habitat. This habitat, also called "snag forest" or "complex early seral" habitat, offers a diversity of food sources to wildlife (nuts, seeds, berries, nectar, palatable foliage, fungi, insects, etc.) and is used by numerous small

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

mammals and birds. Predators, including northern spotted owl, seek out these burned areas due to their abundance of small animal prey species. Studies in post-fire landscapes have shown that northern spotted owl use forest stands that have been burned, including high-severity burned forest, but generally do not use stands that have been burned and logged.

84.     Logging activities, including commercial salvage logging, can reduce or eliminate post-fire foraging habitat. Logging activities can increase forest fragmentation, reducing northern spotted owl nesting, roosting, and foraging habitat, and reducing habitat for prey populations.

85.     The Project "may affect" northern spotted owl. 65 known northern spotted owl territories overlap the Project area, including 26 nest patches. The DM analyzes impacts to northern spotted owl in three paragraphs, concluding that the Project is "likely to adversely affect" northern spotted owl and critical habitat.

86.     Post-fire logging activities, including commercial salvage logging, can cause habitat loss and fragmentation for aquatic species, including salmonids. The Project area contains habitat for three salmonid species listed under the Endangered Species Act: Upper Willamette Spring Chinook, Bull Trout, and Upper Willamette Winter Steelhead.

87.     Ground-based logging operations disturb soils, causing erosion, which leads to runoff into streams and the resulting sedimentation of streams and other adverse water quality impacts. Studies have shown that removal of trees on steep terrain weakens the roots that reinforce soil and slopes and increases the risk of erosion and landslides. This risk is heightened in recently burned areas.

88.     Logging activities, including commercial salvage logging, can remove snags that shade streams, reduce substrate for growing the next generation of trees (some of tree species prefer to establish on dead wood), increase sediment production from heavy use of unpaved

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

roads and off-road soil disturbance by heavy equipment, and reduce the availability of dead wood to streams and upland portions of riparian reserves.

89.    The Project "may affect" Upper Willamette Spring Chinook, Bull Trout, and Upper Willamette Winter Steelhead. The DM provides no analysis of the Project's impacts on these ESA-listed salmonid species, but concludes that the Project is "not likely to adversely affect" these species.

90.    The Project includes about 130 miles of roads within "Riparian Reserves," a land allocation designated pursuant to the Northwest Forest Plan. Riparian Reserves are those portions of watersheds where riparian-dependent resources receive primary emphasis and where special standards and guidelines apply.

91.    The NWFP's Aquatic Conservation Strategy ("ACS") was designed to maintain and restore the health of watersheds and the aquatic ecosystems contained within them. The ACS serves to protect salmon and steelhead habitat on federal lands managed by the Forest Service and Bureau of Land Management.

92.    Objectives of the ACS include the maintenance and restoration of water quality, sediment regimes, instream flows, and habitat for riparian dependent species. These Objectives are safeguarded by standards and guidelines that prohibit or regulate activities in Riparian Reserves that retard or prevent attainment of the ACS Objectives.

93.    Riparian Reserves consist of streams and other waterbodies and the area directly adjacent to them. The ACS sets specific widths of Riparian Reserves based on stream or waterbody type. For example, the Riparian Reserve of fish-bearing streams consists of the stream and the area on each side of the stream extending at least 300 feet slope distance (600 feet total).

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

For permanently flowing nonfish-bearing streams, the Riparian Reserve consists of the stream and the area on each side of the stream extending at least 150 feet slope distance (300 feet total).

94.    Riparian reserves are also intended to enhance habitat for a wide variety of upland wildlife species, including northern spotted owl and others that rely on snag habitat. The NWFP Record of Decision adopted Riparian Reserve Scenario 1 with the explicit intention to benefit: Northern spotted owl, marbled murrelets, marten, red tree vole, vascular plants, bryophytes, amphibians (especially tailed frog, Van Dyke's salamander, clouded salamander, Del Norte salamander, black salamander, Cope's giant salamander, Cascade torrent salamander, and southern torrent salamander), bats, birds, mammals, mosses, arthropods, goshawk, fisher, bufflehead harlequin duck, mollusks,12 species of lichen, and 23 species of fungi, and 130 species that were subject to "additional species analysis" because of viability concerns and received mitigation in the form of wider riparian buffers.

95.    Pursuant to standard and guideline TM-1 of the ACS, timber harvest (logging) is prohibited in Riparian Reserves, subject to narrow exceptions.

96.    The Project authorizes logging in Riparian Reserves. The Forest Service applied a "no harvest" buffer within Riparian Reserves of 30 to 125 feet where trees may be felled but not removed. Outside of the "no harvest" buffer, but still within the Riparian Reserves, the Project authorizes cutting and removal (through commercial logging) of trees in areas which had a greater than 50% mortality rate. In areas with less than 50% mortality rate, commercial logging is prohibited unless required to meet ACS Objectives or to mitigate fuel loading.

97.    The Forest Service contends that logging in Riparian Reserves is allowed because of the exception at TM-1(a): Where catastrophic events such as fire, flooding, volcanic, wind, or

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—23

insect damage result in degraded riparian conditions, allow salvage and fuelwood cutting if required to attain ACS Objectives.

98.     The Forest Service never articulated how the fires resulted in alleged degraded riparian conditions. Logging activities, including commercial salvage logging, are not required to attain ACS Objectives and in fact, will significantly impede post-fire recovery of riparian objectives.

99.     The Project area also includes or is adjacent to three municipal watersheds; two Wilderness Areas, five roadless areas, one Research Natural Area, and numerous cultural sites. All of these areas comprise "resource conditions" that, in addition to specific fish and wildlife species, the Forest Service must specifically evaluate for the presence of "extraordinary circumstances." The DM provides only a brief and cursory analysis of "extraordinary circumstances."

100.     On August 4, 2021, Defendant Warnack signed the Decision Memorandum for the Willamette 2020 Fires Roadside Danger Tree Reduction Project. The Project area is within the Detroit, McKenzie River, and Sweet Home Ranger Districts of the Forest in Lane, Linn, and Marion Counties. Despite repeated calls from Cascadia and other commenters to reduce the scale of the Project, the DM adds 14 miles of roads to the road mileage identified in the Scoping Notification.

101.     The Forest Service's issuance of the DM constitutes final agency action subject to judicial review pursuant to the APA, 5 U.S.C. § 706(2).

///

///

///

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—24

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

## FIRST CLAIM FOR RELIEF
**(NEPA and APA Compliance)**

102.    Cascadia re-alleges and incorporates all preceding paragraphs herein by reference.

**Count 1:**    **Unlawful Use of Inapplicable Categorical Exclusion**

103.    Federal agencies may avoid preparing either an EIS or EA only when the proposed action is "categorically excluded" from NEPA review.

104.    The Forest Service promulgated a series of CEs under NEPA regulations that defined CEs as a "category of actions which do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4 (2019).

105.    36 C.F.R. § 220.6(d)(4) applies to "repair and maintenance of roads, trails, and landline boundaries," with examples including "grading a road and clearing the roadside of brush." When promulgating the regulations, the Forest Service explained that this category applies to "routine repair and maintenance actions." 57 Fed. Reg. at 43,184.

106.    The Forest Service has promulgated a separate CE category specifically for post-fire logging activities, but stipulated that such activities cannot exceed 250 acres. 36 C.F.R. § 220.6(e)(13).

107.    The 2020 Roadside Project authorizes logging operations across thousands of acres of the Forest along 404 miles of roads.

108.    36 C.F.R. § 220.6(d)(4) does not apply to a logging project of this scale, involving the removal of tens of thousands of trees.

109.    The Forest Service's failure to prepare an EIS or even an EA before approving the 2020 Roadside Project, violates NEPA, and is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of procedure required by law. 5 U.S.C. § 706(2).

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

**Count 2:**        **Arbitrary Conclusion That No Extraordinary Circumstances Are Present**

110.    The Forest Service is required to prepare an EA or EIS because "extraordinary circumstances" exist.

111.    One such "extraordinary circumstance" sufficient to preclude use of a CE is based on the degree of potential effects on federally listed threatened or endangered species. 36 C.F.R. § 220.6(b)(1)(i), (2).

112.    The Forest Service admits that the Project is "likely to adversely affect" Northern spotted owl, a federally listed threatened species. The Forest Service also admits that the Project "may affect" listed salmonid species.

113.    Application of a CE is inappropriate if there is a *possibility* that an action *may* have a significant environmental effect.

114.    Other "resource conditions" that the Forest Service must take into account when evaluating extraordinary circumstances include municipal watersheds, Wilderness Areas, roadless areas, Research Natural Areas, and cultural sites. On account of its enormous size, the Project area contains many such areas. The Forest Service offered only conclusory statements as to why the potential effects to these special areas are insignificant.

115.    The Forest Service failed to articulate a rational explanation for its conclusion that no extraordinary circumstances are present.

116.    The Forest Service's failure to prepare an EIS or even an EA before approving the 2020 Roadside Project, violates NEPA, and is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of procedure required by law. 5 U.S.C. § 706(2).

///

///

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—26

**Count 3:**        **Failure to Take a Hard Look**

117.    The NEPA process is designed to ensure that a federal agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

118.    Regulations implementing NEPA provide for "tiering." Tiering is permitted when an agency has previously prepared an EIS or EA addressing general matters and incorporates by reference such general discussions in a subsequent EIS or EA while focusing in the subsequent EIS or EA on more specific issues. 40 C.F.R. § 1508.1(ff) (2021). Tiering to a document that has not itself been subject to NEPA review is not permitted.

119.    For the Project, the Forest Service relied on agency guidance documents to establish its danger tree criteria, specifically, Filip et al. (2016) and Hood et al. (2020). Along with the road segments identified for treatment, the danger tree criteria are the crux of the Project: They determine which trees will be cut. The environmental impacts of the Project therefore turn on the danger tree criteria: The more trees that will be cut, the greater the environmental impacts.

120.    The Forest Service acknowledged that commenters raised concerns over and criticized the agency guidance. However, the Forest Service stated that the sufficiency of the guidance is "outside the scope of this project."

121.    Neither Filip et al. (2016) nor Hood et al. (2020) have undergone NEPA analysis. Members of the public, Tribes, other agencies, and other interested parties never had the opportunity to review and provide feedback on the Project's danger tree criteria and alternatives

to it—either when Filip et al. (2016) or Hood et al. (2020) were issued, or during the Project's planning process. Whether or not the criteria accurately predict the trees that actually pose a danger risk has never been vetted in accordance with NEPA's procedural safeguards.

122.    The Forest Service has broad authority to weigh and balance the competing values associated with managing danger trees and habitat, including the authority to close roads and reduce public use of roads where environmental values dictate. Preparing an EIS or EA would allow the Forest Service to weigh competing values and involve the public in that process. By using a CE and relying on internal guidance documents, the public had no way of knowing whether or how competing interests were weighed and considered.

123.    The Forest Service's failure to take a hard look and reliance on non-NEPA guidance violates NEPA, and is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of procedure required by law. 5 U.S.C. § 706(2).

**SECOND CLAIM FOR RELIEF**
**(NFMA and APA Compliance)**

124.    Cascadia re-alleges and incorporates all preceding paragraphs herein by reference.

125.    The Forest Service has a duty to ensure that the Project is consistent with the NWFP, including the ACS.

126.    The ACS prohibits timber harvest in Riparian Reserves, unless (1) there has been a catastrophic event such as a fire, (2) resulting in degraded riparian conditions, and (3) salvage logging is required to meet ACS Objectives.

127.    The Forest Service has failed to make a rational determination that the Project's logging operations, including commercial salvage logging, in Riparian Reserves is consistent with the ACS.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—28

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

128.    The Forest Service's failure to explain how the 2020 Roadside Project is consistent with the ACS violates NFMA, and is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of procedure required by law. 5 U.S.C. § 706(2).

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiffs and issue the following relief:

A.    Declare the Forest Service has violated the National Environmental Policy Act and its implementing regulations by failing to prepare either an EA or EIS;

B.    Declare the Forest Service has violated the National Environmental Policy Act and its implementing regulations by failing to take a hard look and relying on non-NEPA guidance;

C.    Declare the Forest Service has violated the National Forest Management Act and its implementing regulations by authorizing a project that is inconsistent with the governing forest plan;

D.    Declare the Forest Service's issuance of the DM is arbitrary, capricious, an abuse of discretion, not in accordance with, and/or without observance of procedure required by law under the APA, 5 U.S.C. § 706(2)(A), (D);

E.    Vacate the DM and remand to the Forest Service for additional consideration;

F.    Issue preliminary and permanent injunctive relief prohibiting the Forest Service from authorizing implementation of the 2020 Roadside Project until such time as the Forest Service can demonstrate compliance with the requirements of the National Environmental Policy Act, the National Forest Management Act, and the Administrative Procedure Act;

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

G.      Award Plaintiffs their reasonable fees, costs, expenses and disbursements,

including reasonable attorneys' fees associated with this litigation pursuant to the Equal Access

to Justice Act or other applicable statutes; and

H.      Grant such additional relief as the Court deems just and proper.


DATED this 18th day of August, 2021.


Respectfully submitted,

s/ Oliver J. H. Stiefel
Oliver J. H. Stiefel, OSB # 135436
(503) 227-2212 │ oliver@crag.org
Meriel L. Darzen, OSB # 113645
(503) 525-2725 │ meriel@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214
Fax: (503) 296-5454

*Attorneys for Plaintiffs*

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—30