IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CASCADIA WILDLANDS, et al.,

       Plaintiffs,

and

FOREST SERVICE EMPLOYEES
FOR ENVIRONMENTAL ETHICS,

       Consolidated Plaintiffs,

  v.

DAVID WARNACK, in his official capacity
as Willamette national Forest Supervisor; and
the UNITED STATES FOREST SERVICE,

       Defendants.

Civ. No. 6:21-cv-1227-MC (lead case)
Civ. No. 6:21-cv-1228-MC (trailing case)

OPINION AND ORDER

**MCSHANE, Judge**:

      Plaintiffs Cascadia Wildlands, Oregon Wild, Willamette Riverkeeper, and Forest Service Employees for Environmental Ethics, in two now-consolidated cases, move for a preliminary injunction halting a logging project set to begin on November 7, 2021. Defendants David Warnack and the United States Forest Service urge the Court to allow the project to proceed in order to make roughly 400 miles of Forest Service roads safe for the public, fire fighters, and other first responders.

1 – OPINION AND ORDER

## BACKGROUND

The summer of 2020 was a terrible year for forest fires in the Pacific Northwest. In August and September of 2020, three fires in the Willamette National Forest burned 176,000 acres of forest. "As part of the fire suppression effort, danger trees were cut along roadsides and indirect line clearing and trees were cut and decked." Stiefel Decl. Ex. 2 at 10; ECF No. 16. The Forest Service planned "substantial BAER treatments" on burned areas. BAER is an acronym for "Burned Area Emergency Response," and applies to a "situation when human life or safety, property, or critical natural or cultural resources are at an imminent and unacceptable risk due to post-wildfire threats." Ex. 6 at 3. The BAER teams would "[f]ell trees that have a likely or imminent failure potential if their potential failure zone intersects any road associated with BAER projects or assessments." Ex. 7 at 8. Forest Service regulations allow for such BAER treatments when an "emergency exists that makes it necessary to take urgently needed actions before preparing a NEPA analysis." 36 C.F.R. § 220.4(b).

The National Environmental Policy Act (NEPA) requires an analysis of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). NEPA exists to ensure that agencies take careful consideration of information related to significant environmental impacts of their proposed actions and to give "the public the assurance that the agency 'has indeed considered environmental concerns in its decision making process.'" *Robertson v. Methow Valley Citizens Council* 490 U.S. 332, 349 (1989) (quoting *Baltimore Gas & Electric Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983)). NEPA imposes procedural requirements on agencies but "does not contain substantive environmental standards, nor does the Act mandate that agencies achieve particular substantive environmental results." *Bering Strait for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 947 (9th

Cir. 2008). Agencies may prepare an Environmental Impact Statement (EIS) or an Environmental Assessment (EA). Alternatively, an agency may conclude the action falls under a Categorical Exception (CE). As recently stated in *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 988 (9th Cir. 2020) ("*EPIC*"):

> An agency can comply with NEPA in three ways. It can prepare an EIS; it can prepare an EA; or it can invoke a CE. An EIS is the most searching review. It is required for any action "significantly affecting the qualify of the human environment." 42 U.S.C. § 4332(2)(C). An EA is less searching. Its central function is to determine whether an EIS is required 40 C.F.R. § 1508.9. A CE allows an agency to avoid preparing either an EIS or an EA. CEs are appropriate for "actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect." 40 C.F.R. § 1508.4.

In addition to the "danger tree" removal immediately following the fires, and the later BAER treatments, the Forest Service instituted a Decision Memorandum (DM) for the Willamette 2020 Fires Roadside Danger Tree Reduction Project (the "Project"). This Project is the subject of the parties' dispute here. The Project authorizes the felling of "danger" trees along 404 miles of forest roads. Assuming, based on similar projects, that logging may occur up to 200 feet from either side of the road, Plaintiffs note the Project authorizes logging, without any NEPA analysis, of nearly 20,000 acres of forest. The DM includes the Forest Service's rationale for undertaking the Project:

> On the Willamette National Forest (Forest) in 2020, three large wildfires burned more than 176,000 acres of Forest System lands . . . . As a result of this unprecedented fire season, standing dead and injured trees remain along hundreds of roads across three Ranger Districts of the Forest which are needed for future management and recreation activities. These fire-killed or injured trees pose a danger to public and employee use, management, and enjoyment of the Forest; these areas remain closed to the public until safety concerns are addressed and the danger trees are abated by this project or by natural forces over time.

> To reduce the risk posed by standing dead and injured trees within striking distance of fire affected roads, this project would reduce roadside danger trees

> along hundreds of Forest System roads. A danger tree is any tree, or portion of a tree, that could cause injury or death to people or property because of damage or defect.
>
> The purpose and need of this proposal is to provide for access and improved safety along Forest System roads within the fire burned areas of the Forest and reopen these roads as quickly as possible for public and administrative use. To achieve this purpose, the project would fell dead and injured trees which pose a danger to roads and those traveling along them. In addition to allowing for the reopening of roads to public use, reducing roadside danger trees within these fire-burned areas would provide Forest employees and contractors safer access for fire recovery efforts and other management, survey, and monitoring activities. The project would also ensure continued access for fire suppression ground response in areas that will have increased fire risk in the coming years as fuel loads increase from dead and dying trees begin to decompose and fail across these fire areas. In the event of future wildfires, this project would also provide for safer egress (and ingress) routes for the public and forest employees needing to evacuate to safety.

Steifel Decl. Ex. 1 at 1; ECF No. 16.

Some felled trees will remain where they fall. Ex. 1 at 2. The Project also allows some danger tree removal through timber sales. Ex. 1 at 2. These trees would be felled and removed by ground-based and skyline logging systems. Ex. 1 at 2. The DM notes "[t]he primary intention of these efforts is to abate dangers and improve safe access to the forest; timber sales are simply a tool used to make implementation of this project economically and operationally feasible." Ex. 1 at 2. The Forest Service estimated 9.3 miles of roads will have no trees felled and 154 miles of roads will involve felling of danger trees with no accompanying commercial harvesting. Ex. 1 at 3. 241 miles of roads will be subject to commercial harvesting of danger trees. Ex. 1 at 3.

The DM acknowledged the Project was moving forward "quickly" but noted speed was necessary due to "an urgency to act" due to danger from falling trees. Ex. 1 at 5-6. The DM also referenced the decision to proceed with timber sales:

> The sole purpose of this project is to fell danger trees alongside roads that are hazardous to travel and reopen them while reducing the risk to public and employee safety. The purpose of this project is not timber production; this is not a

4 – OPINION AND ORDER

> salvage harvest. The mitigation of danger trees is challenging, and the extent of this issue after the megafires of 2020 can be very costly. Where appropriate and feasible, the sale of trees is simply an opportunity to offset the cost of this work and reduce the taxpayer burden. Furthermore, leaving all danger trees felled on site may prevent natural regeneration or active forest revegetation and cause other safety issues, such as the accumulation of hazardous fuel loads.

Ex. 1 at 7.

The Forest Service concluded the Project falls under a CE for "repair and maintenance" of roads in the National Forest. That CE allows the Forest Service to take certain actions involving the "repair and maintenance of roads, trails, and landline boundaries" without conducting "further analysis and documentation in an EIS or EA." 36 C.F.R. § 220.6(d)(4). Specifically, the CE covers:

> (4) Repair and maintenance of roads, trails, and landline boundaries. Examples include but are not limited to:
>
> (i) Authorizing a user to grade, resurface, and clean the culverts of an established NFS road:
>
> (ii) Grading a road and clearing the roadside of brush without the use of herbicides;
>
> (iii) Resurfacing a road to its original condition;
>
> (iv) Pruning vegetation and cleaning culverts along a trail and grooming the surface of the trail; and
>
> (v) Surveying, painting, and posting landline boundaries.

36 C.F.R. § 220.6(d)(4).

The Forest Service concluded the repair and maintenance CE:

> is applicable because to maintain the ability of these fire affected roads to functionally provide access to the Forest, danger trees which could strike the road must be abated. Without this action, the roads would remain closed to the public and persist in an inaccessible, unsafe condition for the foreseeable future.

Steifel Decl. Ex. 1 at 8.

5 – OPINION AND ORDER

Plaintiffs argue the Ninth Circuit's opinion one year ago in *EPIC* forecloses the Forest Service's use of the repair and maintenance of roads CE to avoid undertaking a NEPA analysis for the Project. The Court agrees.

## STANDARD OF REVIEW

A party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008). The mere possibility of irreparable harm is not enough. Rather, the plaintiff must establish that this harm is likely. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

## DISCUSSION

In *EPIC*, the Ninth Circuit held that the Forest Service could not use the road repair and maintenance CE for the project at issue there. That project authorized removing any tree: (1) within 200 feet of either side of the road; (2) that was 1.5 tree lengths from the road; (3) that had been partially burned; and (4) had a 50 percent or higher likelihood of falling. *EPIC*, 968 F.3d at 988. There, the Forest Service argued the "[r]oadside hazard treatments involve removing only trees that constitute hazards to the selected roads . . . and that have the potential to reach roadways." *Id.* (alterations in original). That project "authorize[d] the logging of millions of board feet of timber on nearly 4,700 acres of National Forest Land." *Id.* As is the case there, the Forest Service approved that project after a summer of devasting fires.

The *EPIC* court first looked to the road repair and maintenance CE and found it "unambiguous." *Id.* at 990. It noted that despite the fact that "repair" and "maintenance" "are common words with well understood meanings," the CE provided examples—i.e., grading the

road and clearing brush; road resurfacing; pruning vegetation, cleaning culverts, and grooming trails; and surveying, painting, and posting boundaries—which, while not limiting "repair and maintenance" to those specific examples, "the clear inference (even without invoking the principle of ejusdem generis), is that other examples should be similar in character to the examples provided." *Id.* The court then framed the question presented:

> The question before us is whether an extensive commercial logging project that includes felling large, partially burned "merchantable" trees—including 100- and 111-foot trees located 150 and 166 feet from roads, as well as taller trees even farther away—is "repair and maintenance" within the meaning of § 220.6(d)(4).

*Id.*

As is the case here, the Forest Service in *EPIC* argued the project only authorized felling of "hazard trees."[1] The court concluded the scope of the project exceeded the scope of the road repair and maintenance CE:

> We have no doubt that felling a dangerous dead or dying tree right next to the road comes within the scope of the "repair and maintenance" CE. But the Project allows the felling of many more trees than that. The rationale for a CE is that a project that will have only a minimal impact on the environment should be allowed to proceed without an EIS or an[] EA. The CE upon which the Forest Service relies authorizes projects for such things as grading and resurfacing of existing roads, cleaning existing culverts, and clearing roadside brush. A CE of such limited scope cannot reasonably be interpreted to authorize a Project such as the one before us, which allows commercial logging of large trees up to 200 feet away from either side of hundreds of miles of Forest Service roads.

*Id.*

Here, the Forest Service argues the Project allows felling of trees no more than 1 tree height from the road, as opposed to the 1.5 tree length limit in *EPIC*. Therefore, the Forest Service argues that unlike the project in *EPIC*, the Project here applies only to trees posing an imminent danger to those using the roads at issue. The Forest Service is correct that the 1.5 tree

---

[1] The Project at issue here only allows the felling of "danger trees."

7 – OPINION AND ORDER

height limit was a factor in the *EPIC* court's holding. But more important, at least to this Court's reading of *EPIC*, was the scale of the project at issue there, and how that project did not reasonably align with any of the road repair and maintenance CE's examples of "repair" and "maintenance." In concluding those plaintiffs were likely to succeed on the merits, the *EPIC* court noted:

> The Project at issue provides substantial revenue to the Forest Service. It allows logging of commercially valuable trees up to 200 feet on either side of the road; allows felling of partially burned trees that have a 50 percent or higher chance of mortality; allows felling of large trees at such distances from the road that their tips will be 50 or more feet from the road even if the tree falls directly toward the road; and allows logging over an area of approximately 4,700 acres. *Under no reasonable interpretation of its language does the Project come within the CE for "repair and maintenance" of roads.*"

*Id.* at 991 (emphasis added).

The Project at issue, despite limiting felling to only those trees within 1 tree height of a road, dwarfs the project at issue in *EPIC*. The project in *EPIC* covered 180 miles of roads. This Project covers 404 miles of roads. The *EPIC* project applied to 4,700 acres. Even the most conservative estimate of the Project doubles the applicable acreage.[2] "The rationale for a CE is that a project that will have only a minimal impact on the environment should be allowed to proceed without an EIS or an[] EA." *EPIC*, 968 F.3d at 990. This Project allows commercial logging that, at least at this stage, will almost certainly have more than a minimal impact on the environment. The commercial logging allowed here does not remotely resemble grading or repaving roads, cleaning culverts, or removing brush (without the use of herbicides) near roads. "A CE of such limited scope cannot reasonably be interpreted to authorize a Project such as the

---

[2] The *EPIC* project limited felling to trees located within 200 feet on either side of the road. Because this Project limits felling to trees within 1 tree length of the road, exact acreage estimates are not possible. Regardless, this Project covers at least twice the acreage of the project in *EPIC*.

8 – OPINION AND ORDER

one before [this Court], which allows commercial logging of large trees [within 1 tree height] from either side of hundreds of miles of Forest Service roads." *Id.*

This Court is not alone in concluding that *EPIC* applies to the overall scale of the project (and not merely to the height of the trees to be felled). Just one month ago, another district court reached the same conclusion. *See Forestkeeper v. U.S. Forest Serv.*, No. 1:21-cv-0141-DAD-BAM, 2021 WL 4553885 at *4 (E.D. Cal. Oct. 5, 2021) ("The central holding of *EPIC* was that—as a matter of statutory interpretation—CE 4 could not be used to authorize a large-scale commercial logging project.") (citing *EPIC*, 968 F.3d at 990)). In finding the Forest Service's argument "misses the point," that district court noted:

> The Ninth Circuit did acknowledge that felling of dangerous trees located "right next to the road" would come within the scope of the "repair and maintenance" CE and, in that context, discussed the scope of a project that could be authorized pursuant to CE 4. *EPIC*, 968 F.3d at 990-91. Nonetheless, the court made clear that it was the type and scale of the project at issue in that case which prevented it from being authorized pursuant to CE 4 and mandated further NEPA environmental analysis. *Id.* In focusing its supplemental arguments on tree heights, defendant USFS has failed to address the foundation of the *EPIC* holding—that the text and nature of CE 4 does not apply to this type of extensive project at all.

*Forestkeeper*, 2021 WL 4553885 at *5.

As discussed above, in *EPIC*, the court concluded, "[w]e have no doubt that felling a dangerous dead or dying tree right next to the road comes within the scope of the 'repair and maintenance' CE." 968 F.3d at 990. It also noted, however, that "[w]hile all of the trees within the scope of the Project may be hazardous in some sense, many of them pose no imminent hazard." *Id.* So too here. The *Field Guide for Danger-Tree Identification and Response along Forest Roads and Work Sites in Oregon and Washington* ("Filip") acknowledges that the Project allows the felling of trees that are not currently at risk of failing, but may become a danger after five years. Stiefel Decl. Ex. 3 at 46; Filip at 44. Filip acknowledges:

9 – OPINION AND ORDER

> For most recently killed trees, exposure duration along roads mainly is intermittent (drive-by traffic) *and therefore the trees are not a danger.* However, due to the large number of recently killed trees in these situations, there is a higher risk of tree failures occurring, because stands are often more open following large disturbances, and trees may be more prone to windthrow or windshatter. *After five years, most of these trees (except cedar, juniper, larch, or large Douglas-fir) will have imminent-failure potential and therefore will become danger trees. The challenge is deciding when to treat such trees that are not now a danger but will become danger trees in five years.* Waiting five years for thousands of trees to become dangers presents at least three problems for forestland managers: 1) some trees may fail before they have been dead for five years, 2) older, dead trees have less commercial value because of delay and defect than recently killed trees, and 3) older, dead trees are more dangerous to fell because of increased decay and defect.

*Id.* at 46-47 (emphasis added).

The Project's DM acknowledges that due to a variety of factors other than any imminent danger, such trees, even with a low likelihood of failing within 5 years, are subject to felling:

> The R6 Danger Tree Guide indicates that recent dead Douglas-Fir >20" and Cedar with no failure indicators have a low likelihood of failure within 5 years. Given the large number of trees in this condition, the difficulties in safely mitigating them in the future as they decay, the need to maintain safe conditions along these corridors over time, the increase in exposure to employees and the public from these trees, the cost of managing these trees into the future, and other resource impacts from repeated entry, recently killed Douglas-Fir >20" and Cedar meeting the cutting criteria above are included in the prescription for danger tree removal.

Stiefel Decl. Ex. 1 at 30.

The DM confirms this is not a trivial number of trees. *Id.* (noting "the large number of trees in this condition"). While the Court recognizes the significant problems facing the Forest Service, the DM confirms the Project allows the felling of trees that are not in any imminent danger of failing on the rationale that felling them now will avoid problems down the road. In this sense, the Project is akin to that in *EPIC* because, "[w]hile all of the trees within the scope of the Project may be hazardous in some sense, many of them pose no imminent hazard." *EPIC*, 968 F.3d at 990. As was the case in *EPIC*, "[t]he Project does not target only trees that pose an

10 – OPINION AND ORDER

immediate danger to travelers." [3] *Id.* at 991. Pl.'s Mem. at 16; ECF No. 11. Given the immense scale of this Project, which allows the felling of trees along 404 miles of forest roads, Plaintiffs have demonstrated a likelihood of success on the claim that the Forest Service may not use the road repair and maintenance CE to avoid any NEPA review of the Project.

Having concluded Plaintiffs established a likelihood of success on the merits, the Court turns to whether Plaintiffs have shown "that irreparable injury is likely in the absence of an injunction." [4] *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (quoting *Winter*, 555 U.S. at 22). Plaintiffs submitted declarations from members of their organizations stating their use and enjoyment of the proposed logging areas would be significantly diminished should the Court allow the Project to proceed absent the requisite NEPA analysis. ECF No. 12-15. These declarations are substantially similar to declarations the *EPIC* court concluded established a sufficient threat of irreparable harm. *EPIC*, 968 F.3d at 991. "Ongoing harm to the environment constitutes irreparable harm warranting an injunction. When a project may significantly degrade some human environmental factor, injunctive relief is appropriate." *Id.* (quoting *Southeast Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1100 (9th Cir. 2006)).

---

[3] The Project authorizes felling of trees on 326 miles of Level 2 roads. Level 2 roads are only open to high clearance vehicles. Steifel Dec. Ex. 5 at 6. The Forest Service notes that on these roads, "[t]raffic is normally minor[.]" *Id.* "Motorists should have no expectations of being alerted to potential hazards while driving these roads." *Id.* Additionally, the possibility that fallen trees—many of which have a low likelihood of failing within 5 years—will impede first responders as they respond to fires is not an imminent danger or hazard, but rather a speculative hazard that may occur at some future date. While the Court understands it would be more convenient and cost-effective for the Forest Service to prevent future road hazards via a preemptive commercial logging operation not subject to NEPA review, the scope of this Project exceeds that open to a CE. *See EPIC*, 968 F.3d at 990 ("The rationale for a CE is that a project that will have only a minimal impact on the environment should be allowed to proceed without an EIS or an[] EA. . . . A CE of such limited scope cannot reasonably be interpreted to authorize a Project such as the one before us, which allows commercial logging of large trees up to 200 feet away from either side of hundreds of miles of Forest Service roads.").

[4] The Forest Service does not challenge Plaintiffs' standing to bring this action.

11 – OPINION AND ORDER

The Forest Service argues that an injunction "would only prevent the Forest Service from doing what will occur through natural forces in the next few years." Resp. 40; ECF No. 19 (quoting *Helena Hunters & Anglers Ass'n v. Marten*, 2019 WL 5069002, at *4 (D. Mont. Oct. 9, 2019)). This argument misses the mark. As outlined above, the Project allows the felling of a "large number of trees" with "a low likelihood of failure within 5 years." Steifel Decl. Ex. 1 at 30. Generally, an agency must complete an EA within 1 year and an EIS within 2 years. 40 C.F.R. § 1501.10(b). In other words, the Forest Service could complete a NEPA analysis several years before many of the trees are likely to fail. Therefore (and considering the Project is set to begin felling trees in a matter of days), the Court concludes Plaintiffs have established an imminent threat of irreparable harm.

The balance of equities is a tougher question. Here, because the government is a party, the Court must "consider the balance of equities and the public interest together." *EPIC* 968 F.3d at 991 (quoting *Azar*, 911 F.3d at 581). There is no doubt the fires at issue, and in fact up and down the Western United States, were as devastating as they were unprecedented. The unfortunate reality is that the Forest Service is quite likely to face similar fire threats in the coming years. Managing those threats, which of course includes making sure forest roads are accessible by first responders, is without question a legitimate agency interest. So too with the agency's responsibility to manage the forest in a way that hopefully lowers the risks of future fires. Often, as is the case here, the Forest Service determines the most efficient way of fulfilling multiple duties is via contracts for commercial logging operations. The *EPIC* court recognized these important agency interests. 968 F.3d at 992. Often competing with these legitimate interests is the public's interest in ensuring the Forest Service follows the law, which includes the requirement that the agency complies with NEPA.

As with seemingly every other issue in this action, *EPIC* provides useful guidance.[5] Recognizing similar competing interests, the court concluded:

> In the end, however, we are not persuaded that public safety will actually be put at risk by granting the relief EPIC seeks. EPIC has never denied the Forest Service's right to rely on the CE for road repair and maintenance in order to fell trees next to the road that pose an immediate danger to users of the road. To the extent the Forest Service authorizes salvage logging that constitutes more than repair and maintenance, EPIC seeks only the preparation of an EIS or an EA. The Forest Service has not shown that fulfilling its obligation to prepare an EIS or an EA is inconsistent with the goal of public safety.
>
> The public interest is served by requiring the Forest Service to comply with the law. We have concluded, above, that the Project does not qualify for the CE for road maintenance and repair. The Forest Service must therefore prepare either an EIS or an EA.

*Id.*

In the Court's view, the only remaining question is the scope of the injunction. In crafting an injunction, "[t]he scope of remedy must be no broader and no narrower than necessary to redress the injury shown by the plaintiff[s]." *Azar*, 911 F.3d. at 584. The Forest Service must be permitted to "rely on the CE for road repair and maintenance in order to fell trees next to the road that pose an immediate danger to users of the road." *EPIC*, 968 F.3d at 992. Until the Ninth Circuit provides additional guidance, utilizing commercial logging operations to fell trees with little likelihood of imminent failure, merely to ensure that forest roads are clear during some future potential fire, is beyond the scope of the CE.[6] To conduct such activities in response to no

---

[5] More directly, the Court finds *EPIC* directly on point and concludes that recent decision is fully dispositive of the outcome here.

[6] The Court certainly recognizes that such work is vitally important to the Forest Service's obligations in regard to overall forest management, to say nothing of ensuring the ability to properly and safely respond to future emergencies. The Court merely concludes that under *EPIC*, such activities do not fall under the CE because there is no "imminent hazard" and such activity, at least at this stage, has more than "only a minimal impact on the environment[.]" 968 F.3d at 990.

13 – OPINION AND ORDER

imminent danger from failing trees is beyond the scope of the CE. The Forest Service must therefore prepare an EA or an EIS.

As to the scope of the injunction, the Forest Service is enjoined from felling any tree with a low likelihood of failure within 5 years as determined in Filip. Steifel Decl. Ex. 3 at 49. The Forest Service is enjoined from felling any tree with a likely failure potential in Filip. *Id.* at 25. Filip indicates these trees "are defective or decayed, but it would take moderate effort to make them fail." *Id.* As these trees have a high probability of failure within 3 to 5 years, they fall outside of the CE for the reasons discussed above. The Forest Service may, however, fell any tree at risk of imminent failure (as defined in Filip) within striking distance of a road. "Imminent failure" in this sense means: "Trees or their parts are so defective or decayed that it would take little effort to make them fail. These trees or parts have a high probability of failure within one year." Steifel Decl. Ex. 3 at 25. The Forest Service must leave any felled tree where it falls, with the exception that it may remove any tree that falls on a road to a safe location beside the road. To clarify, the Forest Service is enjoined from removing any felled tree pending the completion of an EA or EIS.

The Forest Service argues should the Court issue an injunction, it "should impose a meaningful bond that contributes to making the Forest Service and the public whole[.]" Resp. at 42. The Forest Service argues delaying this Project may cost the Forest Service up to $24,000,000. Plaintiff Cascadia Wildlands 2021 legal budget is $11,000. Cotton Decl. ¶ 25. Requiring the posting of a bond here would significantly impact the ability for the other Plaintiffs to bring such actions in the future. LeGue Decl. ¶ 16; Williams Decl. ¶ 33; Second Stahl Decl. ¶ 9. The Court concludes requiring a bond in this instance would chill Plaintiffs'

14 – OPINION AND ORDER

right to seek judicial review of agency actions and declines to impose even a nominal bond. *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005).

IT IS SO ORDERED.

DATED this 5th day of November, 2021.

      /s/ Michael McShane
      **Michael J. McShane**
      **United States District Judge**

15 – OPINION AND ORDER